United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDY MARTIN,<br><br>          Plaintiff,<br><br>   v.<br><br>CITY OF SAN JOSE, et al.,<br><br>          Defendants. | Case No.  19-cv-01227-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT; AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Docket Nos. 47-48 |

Plaintiff Andy Martin has filed suit against Defendants the City of San Jose and Alexandre Vieira-Ribeiro ("Officer Ribeiro"), a City police officer.  The suit relates to an incident in which Officer Ribeiro was pursuing Mr. Martin in a police car and then hit Mr. Martin and ran him over. Currently pending before the Court are (1) Defendants' motion for partial summary judgment and (2) Mr. Martin's motion for partial summary judgment.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion and **DENIES** Mr. Martin's motion.

## I.      FACTUAL & PROCEDURAL BACKGROUND

A.    Causes of Action

In his complaint, Mr. Martin asserts the following causes of action:

(1) Unlawful seizure (Fourth Amendment) in violation of 42 U.S.C. § 1983 – against Officer Ribeiro only.  According to Mr. Martin, at the time he was hit and run over, Officer Ribeiro "did not have reasonable suspicion and/or probable cause to justify any seizure whatsoever.  Defendant simply ran over Plaintiff and determined

afterwards if he matched the identifying information of a suspect."  Compl. ¶ 19.

(2) Excessive force (Fourth Amendment) in violation of 42 U.S.C. § 1983 – against Officer Ribeiro only.  According to Mr. Martin, Officer Ribeiro used excessive force when he ran over Mr. Martin with the police car.  In addition, after Mr. Martin was already run over, Officer Ribeiro "backed over Plaintiff again."  Compl. ¶ 22.

(3) Unconstitutional custom or policy in violation of 42 U.S.C. § 1983 – against the City only.  According to Mr. Martin, Officer Ribeiro "has not been re-trained or disciplined for explicit use of excessive and deadly force against an unarmed and incapacitated person."  Compl. ¶ 26.  Mr. Martin also alleges that "this incident is only the latest to a collection and trend of excessive and deadly force incidents committed by SJPD officers."  Compl. ¶ 26 (citing three incidents in which a person was shot and either killed or seriously injured).

(4) Battery in violation of California Penal Code § 242 – against Officer Ribeiro only.

(5) Negligence – against both Defendants.[1]

(6) Unlawful seizure and excessive force (Fourth Amendment) in violation of the Bane Act (California Civil Code § 52.1) – against both Defendants.[2]

In their motion for partial summary judgment, Defendants seek summary judgment on all causes of action except for the fifth (negligence).

In his motion for partial summary judgment, Mr. Martin seeks summary judgment with respect to liability (not damages) on his excessive force and negligence claims.  For the negligence claim, Mr. Martin would also leave for the jury the issue of comparative fault which would impact damages.

---

[1] The title for the cause of action indicates that only Officer Ribeiro is being sued for negligence. However, in a later paragraph, Mr. Martin alleges that he is seeking to hold the City vicariously liable.  *See* Compl. ¶ 44.

[2] Similar to above, the title for the cause of action indicates that only Officer Ribeiro is being sued for a violation of the Bane Act.  But, in a later paragraph, Mr. Martin alleges that he is seeking to hold the City vicariously liable.  *See* Compl. ¶ 52.

United States District Court
Northern District of California

B.      <u>Evidence of Record</u>

        The evidence submitted by the parties reflects as follows.  Where there are disputed facts

and/or objections to evidence,[3] they are so noted.

        1.      <u>Dispute with Mall Security Guards</u>

        The incident at issue took place on May 2, 2018.  The relevant events began in the

afternoon, when Mr. Martin, his cousin (Jovani Avila), and a third individual (a friend of Mr.

Avila) were at a restaurant in San Jose.  Mr. Martin had two mimosas at the restaurant.  *See* Martin

Depo. at 59-60.

        At about 4:15 p.m., Mr. Martin and his two companions took a Lyft from the restaurant to

Eastridge Mall.  *See* Martin Depo. at 61.  There, they went to "Round 1," an entertainment

establishment, where they played pool, bowled, and ate and drank.  *See* Martin Depo. at 62-64.  At

his deposition, Mr. Martin testified that the three shared about three pitchers (about two glasses

each from each pitcher).  *See* Martin Depo. at 64-66.  But in a police interview conducted shortly

after the incident, Mr. Martin stated that he had four pitchers to drink.  His BAC (taken at the

hospital after the incident) was .126%.  *See* Sciba Decl. ¶ 6.

        At some point, a woman joined the three individuals at Round 1.  *See* Martin Depo. at 61.

And at some point, after a phone call with her boyfriend, the woman became very upset (crying)

and walked out of Round 1.  Mr. Martin followed her.  *See* Martin Depo. at 69-70.  A security

guard then told Mr. Martin to leave, apparently because she thought Mr. Martin was making the

woman angry.  *See* Martin Depo. at 70.  Mr. Martin, however, was allowed to go back into Round

1.  Subsequently, a second security guard approached Mr. Martin and his companions and asked

them to leave, purportedly because they were being too loud.  *See* Martin Depo. at 71-72.  They

did not.  The security guard walked away, but then three security guards approached Mr. Martin

and his companions and asked them to leave.  *See* Martin Depo. at 72-73.  It appears that the

cousin's friend left right away.  *See* Martin Depo. at 76.  The security guards and Mr. Martin then

began to verbally engage with one another (*e.g.*, the "guards told us to get the fuck out of here"

---

[3] Only relevant objections are addressed.

3

and that "they're going to beat us up" "if we don't get out of here" and "I told [one guard] he didn't want no problems"). Martin Depo. at 73-74. However, neither Mr. Martin nor his cousin threatened the guards – either verbally or physically. *See* Martin Depo. at 77-78 (denying that they said they were "going to put holes" in the guards or that they showed a knife).

Because of the security guards, Mr. Martin and his cousin eventually left the mall.

### 2.    Bike Trail

Upon leaving, Mr. Martin and his cousin first got onto a Valley Transportation Authority ("VTA") bus at a stop near the mall; however, they soon got off, apparently because they decided to take a Lyft instead. *See* Martin Depo. at 79-80. The two then decided to get a Lyft from a shopping center across the street from the mall. To get to the shopping center, they had to cross the Capitol Expressway (8 lanes of traffic total, 4 going each way). *See* Martin Depo. at 80-83, 88. Mr. Martin and his cousin did not cross the Expressway at a crosswalk. *See* Martin Depo. at 85. The Expressway had a center divide, dividing one set of lanes from the other. *See* Martin Depo. at 86. There was a chain-link fence, higher than 6 feet, on the center divide. Mr. Martin and his cousin had to climb over the fence to cross the Expressway. *See* Martin Depo. at 86-88.

After crossing the Expressway, Mr. Martin and his cousin did not go into the shopping center area directly but instead went onto a nearby bike path, which was divided from the shopping center parking lot by a chain-link fence. *See* Martin Depo. at 90-91. The chain-link fence – at least 6 feet high – is to the left of the trail. To the right of the trail is a creek. The width between the fence and creek is about 40 feet. *See* Sciba Decl. ¶ 3.

### 3.    Police Dispatch

Officer Ribeiro was working as a solo patrol officer near the area. He was wearing a police uniform and driving a marked police car. *See* Ribeiro Decl. ¶ 3. On the radio, he heard the police dispatch report "an incident at Eastridge Mall in which two Hispanic males were threatening to shoot security guards but no weapons had been seen." Ribeiro Decl. ¶ 4. The same or similar information was provided on the computer in Officer Ribeiro's police car (*i.e.*, CAD or Computer-Aided Dispatch). *See* Ribeiro Decl. ¶ 4; Buelna Decl., Ex. 2 (CAD log) (reflecting the following note from dispatch, at about 8:16 p.m.: "2 HMA'S ARE OUTSIDE OF RED

United States District Court
Northern District of California

1    ROBIN . . . THREATENING TO SHOOT SEC GUARDS . . . NO WEPS SEEN . . . MTF").

2         Officer Ribeiro then heard and "saw on the CAD a report that the men were reaching for

3    their waistbands" and that "[o]ne was reaching for his waist and hat, threatening the security

4    guard.  The individuals were described as Hispanic male adults in their mid-twenties to thirties.

5    One had a black hat, white t-shirt, and grey pants.  The other had a white shirt, blue jeans, black

6    ha[t] with San Jose on it."  Ribeiro Decl. ¶ 5; *see also* Buelna Decl., Ex. 2 ("MALE WAS

7    REACHING FOR HIS WAIST AND HIS HAT THREATENING SEC").  Mr. Martin was the

8    second individual described although it is far from clear whether Officer Ribeiro knew so at the

9    time.

10        The CAD later indicated that the two suspects "were walking towards VTA" and

11   threatening to stab security.  Ribeiro Decl. ¶¶ 6-7; *see also* Buelna Decl., Ex. 2 (note from

12   dispatch, at about 8:19 p.m.).  The police dispatch then "upgraded to call to a weapons call" and

13   "changed the status of the call to 'priority 1,' which is a top priority, calling for an emergency

14   response."  Ribeiro Decl. ¶ 9; *see also* Buelna Decl., Ex. 2.  Dispatch then reported that one of the

15   men had pulled out a knife, and identified the man with the knife as the one with the white shirt

16   and black Sharks hat.[4]  *See* Ribeiro Decl. ¶ 10; *see also* Buelna Decl., Ex. 2 ("NOW

17   THREATENING TO STAB SEC"); "MALE PULLED OUT A KNIFE"; "MALE WITH THE

18   KNIFE – HMA WHI SHIRT BLK SHARKS HAT ON BUS 70").

19        Officer Ribeiro was close by the Eastridge mall "facing towards the VTA transit center"

20   and saw "two Hispanic males who matched the descriptions provided by dispatch running across

21   from the bus area of the transit center across Capitol Expressway."  Ribeiro Decl. ¶ 12.  Officer

22   Ribeiro activated the lights and siren on his police car and started to pursue the individuals.  He

23   saw the suspects climb over the chain-link fence on the center divide on the Capitol Expressway

---

[4] In his motion, Mr. Martin suggests that he could not have been the person with the knife (as reported by dispatch) because, as video footage shows, he had no hat on.  *See* Pl.'s Mot at 2 n.1. However, in his own deposition, Mr. Martin admits that he had been wearing a hat, *see* Martin Depo. at 66, and it appears that the hat fell off during the police pursuit.  *See* Ribeiro Opp'n Decl. ¶ 12 (testifying that, after the collision, he took photographs related to the incident; "[b]etween the entrance to the pathway . . . and the location of the accident, I found a black San Jose Shark's hat on the dirt path").

and then go onto the bike trail near the shopping center.  *See* Ribeiro Decl. ¶¶ 12-13.  Officer

Ribeiro was familiar with the shopping center (but not the bike trail[5]): "It is a popular shopping

center, with an In-N-Out Burger, Starbucks, Safeway, and several other businesses. . . . It is a busy

shopping center, including in the evenings."  Ribeiro Decl. ¶ 16.  Nothing indicated to Officer

Ribeiro that the individuals were intoxicated.  *See* Ribeiro Depo. at 65.

        4.     <u>Collision</u>

             a.     <u>Mr. Martin's Version of Events</u>

The following constitutes Mr. Martin's version of the events.

According to Mr. Martin, he and his cousin were about half a football field into the bike

trail when he noticed the police car with lights and sirens about five car-lengths back.  *See* Martin

Depo. at 94-95, 104-05.  The police officer did not issue any verbal commands to him and his

cousin.  *See* Martin Depo. at 101.  Mr. Martin and his cousin had been walking but eventually they

began to jog.  Mr. Martin thought that, if he were to stop, he would get hit.[6]  *See* Martin Depo. at

102.

Mr. Martin and his cousin were on the right side of the trail, near the creek, with Mr.

Martin to the left of his cousin.  Although Mr. Martin started on the right side of the trail, he

started to move over gradually to the left side to get away from the police car.  *See* Martin Depo. at

105-06.  When Mr. Martin went left, the police car also went left after him.  *See* Martin Depo. at

107, 110.  Mr. Martin moved right to get away from the police car.  The police car then hit him.

*See* Martin Depo. at 112; *see also* Martin Depo. at 114 (denying that he turned to the left prior to

getting hit).  He was hit in the lower back and fell to the ground on his stomach where he was run

over (in his lower back and/or pelvis).  *See* Martin Depo. at 113, 116, 118, 122-23.  Mr. Martin

then blacked out but woke up when he felt pain in his ankle.  He was under the police car.[7]  *See*

---

[5] *See* Ribeiro Depo. at 75.

[6] Defendants suggest that Mr. Martin had no interest in actually stopping for the police because he
had outstanding warrants.  *See, e.g.*, Defs.' Opp'n at 1, 14.  In this regard, Defendants also note
that Mr. Martin gave his twin brother's name to the police instead of his own after he was hit.

[7] Mr. Martin was interviewed by the police (Sgt. Sciba) after the incident while he was in the
hospital.  Mr. Martin at that time gave a somewhat different account of what had happened.  For

United States District Court
Northern District of California

Martin Depo. at 117.

Mr. Martin maintains that there were three hits total: (1) when he was initially hit by the car, (2) then run over in the pelvic area, and (3) then run over on the ankle – when Officer Ribeiro backed his car up to run over him a second time.[8]  *See generally* Buelna Decl., Ex. 17 (report from Dr. Smith, a forensic reconstruction expert)[9]; *see also* Buelna Opp'n Decl., Ex. 1 (rebuttal report from Dr. Smith, discussing hits and related injuries).

A police officer (*i.e.*, Officer Ribeiro) then came up, patted Mr. Martin down, and handcuffed him.  *See* Martin Depo. at 119-25.  At some point, Officer Ribeiro also had Mr. Martin put into leg irons.  *See* Ribeiro Depo. at 94-95.

### b. Officer Ribeiro's Version of Events

The following constitutes Officer Ribeiro's version of the events.

Officer Ribeiro still had the lights and sirens on his police car activated as he entered the bike trail.  He followed the two men in his car for about 30 seconds.  He tried to maintain a safe distance of about 15 feet from the men as they were running but sometimes it was more and sometimes less – *e.g.*, sometimes as close as 3 feet, sometimes as far as 20-30 feet.  *See* Ribeiro Depo. at 78, 85, 88-89; *see also* Ribeiro Decl. ¶ 19.  As he was driving, he had the police radio in his right hand – his dominant hand – using it to communicate.  *See* Ribeiro Depo. at 86-87, 100. One time, Officer Ribeiro saw Mr. Martin reach into his pocket or waistband as he was running.

---

example, Mr. Martin stated that he was walking down the trail fast, not running, because he was trying to catch a Lyft and did not want it to leave him.  Also, he could not recall being with another person.  *See generally* Zoglin Decl., Ex. B (interview of Mr. Martin).

[8] In their reply brief, Defendants make much of the fact that Mr. Martin did not testify during his deposition that the police car backed over him.  *See* Defs.' Reply at 9-10.  But this is a silly argument.  As indicated above, Mr. Martin blacked out after being hit and then awoke because of pain in his ankle.

[9] Defendants have generally objected to the Smith expert report as well as other reports from Plaintiffs' experts because they were unsworn, *i.e.*, not attached to declarations from the experts. But Defendants rely on authorities that predate the 2010 amendments to Federal Rule of Civil Procedure 56.  Those amendments included the addition of a new subsection to Rule 56 – *i.e.*, subsection (c).  Rule 56(c)(2) provides: "('A party may object that the material cited to support or dispute a fact *cannot be presented in a form that would be admissible in evidence*.'  Fed. R. Civ. P. 56(c)(2) (emphasis added).  Furthermore, Mr. Martin has now cured any problems with the submission of expert declarations as part of his reply brief.

United States District Court
Northern District of California

1 | *See* Ribeiro Depo. at 92; Ribeiro Decl. ¶ 21.  (Mr. Martin admits that he pulled up his pants when

2 | walking on the trail before the police car came on to the trail.  He also admits that he might have

3 | pulled up his pants more than once on the trail.  *See* Martin Depo. at 109-10.)

4 |       Officer Ribeiro saw Mr. Martin start to drift toward the left (while the cousin continued

5 | straight).  Officer Ribeiro was concerned that Mr. Martin would try to get over the fence (he had

6 | recently climbed the fence at the Expressway center divide) and put people at the shopping center

7 | in danger (given that dispatch had indicated a knife at least).  Officer Ribeiro was also concerned

8 | about having Mr. Martin on his left because then he would effectively be surrounded by the

9 | suspects on each side.  *See* Ribeiro Depo. at 78, 93; Ribeiro Decl. ¶¶ 22, 24.  Officer Ribeiro

10 | therefore drove to the left of Mr. Martin and slowed to about 3 mph; Officer Ribeiro then drove

11 | ahead and turned to the right.  Officer Ribeiro went right with the intent of putting his car into the

12 | suspects' path of travel and stopping them.  *See* Ribeiro Depo. at 102, 105; Ribeiro Decl. ¶¶ 26-28.

13 |       Mr. Martin suddenly turned to the left (*i.e.*, toward the car) and fell to the ground.  *See*

14 | Ribeiro Decl. ¶¶ 29-30.  Officer Ribeiro "felt the front right tire of [his] vehicle lift off the

15 | ground."  Ribeiro Decl. ¶ 30.  He applied the brakes.  *See* Ribeiro Depo. at 42; Ribeiro Decl. ¶ 31.

16 | Officer Ribeiro then shifted gears to put his car from drive into park.  To go from drive to park, he

17 | had to pass through reverse.  In doing so, Officer Ribeiro got hung up for a moment in reverse

18 | because he had his radio in his right hand (his shifting hand).  However, even though the car was

19 | in reverse gear, he did not actually drive backwards or otherwise back up over Mr. Martin.  *See*

20 | Ribeiro Depo. at 44-45; Ribeiro Decl. ¶ 35.  Officer Ribeiro did not intend to hit or run over Mr.

21 | Martin.  *See* Ribeiro Decl. ¶ 34.

22 |       Officer Ribeiro handcuffed Mr. Martin and then called an ambulance.  *See* Ribeiro Decl. ¶

23 | 32.  At some point, Officer Ribeiro had Mr. Martin put into leg irons – purportedly to secure him

24 | so that he would not flee if the paramedics wanted to remove the handcuffs.  *See* Ribeiro Depo. at

25 | 94-95.

26 |       No weapon was ever recovered.  *See* Ribeiro Depo. at 82.  Officer Ribeiro also admitted

27 | that he did not see either Mr. Martin or the cousin throw an object away at any point.  *See* Ribeiro

28 | Depo. at 82.  Although no weapon was recovered, it appears that Mr. Martin was still

*(left margin, vertical)* United States District Court / Northern District of California

1  "CONVICTED of a misdemeanor violation of California Penal Code section 417(a)(1) (drawing

2  or exhibiting a deadly weapon, other than a firearm, in a rude, angry, or threatening manner) on

3  the date of incident at issue in this lawsuit."  Zoglin Decl., Ex. H (admission in response to RFA

4  No. 12).

c.  Other Evidence

6  Video footage of the collision has been submitted for the Court to review.  There are two

7  critical videos.  The first is from Officer Ribeiro's body camera, which captures the view from

8  inside the car.  *See* Buelna Decl., Ex. 9 (Ribeiro video).  The second is from another officer –

9  Officer Purnell – who responded to the dispatch and who viewed the collision from the outside (on

10  the other side of the chain-link fence).  *See* Buelna Decl., Ex. 13 (Purnell video).

11  The Ribeiro video shows Officer Ribeiro steering with his left hand (the right hand is

12  holding the radio) toward the left, then right, and then to the left again.  (Mr. Martin seems to be

13  taking the position that Officer Ribeiro hit him when the officer turned to the left the second time.

14  *See* Pl.'s Reply at 2.)  It then appears that Officer Ribeiro shifts gears in two separate motions.

15  The video also shows that Officer Ribeiro denies running Mr. Martin over ("Nobody ran you over,

16  dude").  In his deposition, Officer Ribeiro said he did not know why he said that; he suspected that

17  some part of the car had rolled over Mr. Martin and he was still processing in his mind what had

18  happened.  *See* Ribeiro Depo. at 81.

19  The Purnell video shows the men running and the police car following in what appears to

20  be close proximity.  The collision is not caught on camera, but the video does reflect the back of

21  the police car after the collision – with the tail lights going from red (brake) to white (reverse) and

22  then back to red (brake).  Based on the Court's review, is not clear one way or the other from the

23  video whether the car backed up, but the car does appear to jolt up a little when the tail lights

24  change in color from red to white.  In a declaration, Officer Purnell asserts that "Officer Ribeiro's

25  patrol car did not back up or move in reverse."  Purnell Decl. ¶ 11.  Defendants have also offered a

26  declaration from a video expert who testifies that Officer Ribeiro did not reverse.  *See* Flower

27  Decl., Ex. A (Flower Report at 10) ("While in reverse gear, between [video] frames 1247 and

28  1307 the tree line reflection is not moving laterally in the [left] side view mirror.  That indicates

United States District Court
Northern District of California

9

1   [the vehicle] is not moving.  Those frames would show lateral movement right to left if [the

2   vehicle] were moving backwards.").  Mr. Martin challenges the validity of the video expert's

3   opinion.  *See* Pl.'s Reply at 3 (arguing that "Defendant reversed with his door ajar and moving,

4   [and] Mr. Flowers does not explain how he accounted for the change in position of the door and its

5   side mirror as contributory to the alleged stillness of the tree lining in the mirror"; also arguing

6   that "you cannot consistently see the tree lining throughout the cited frames").

7        5.    Investigation of Collision

8        Sgt. Sciba was a supervisor on duty on the day of the incident.  He responded to the scene

9   after the collision.  *See* Sciba Decl. ¶ 3.  He interviewed Mr. Martin at the hospital.  *See* Sciba

10   Decl. ¶ 5; *see also* Zoglin Decl., Ex. B (interview of Mr. Martin).  He also later reviewed the body

11   camera video footage and the CAD report.  *See* Sciba Decl. ¶ 7.  Sgt. Sciba concluded that the

12   primary collision factor was Officer Ribeiro's turning motion but that a contributing factor was

13   Mr. Martin's unpredictable turning motion while he was fleeing (compounded by the fact that he

14   was likely impaired from drinking alcohol).  Sgt. Sciba also concluded that Officer Ribeiro could

15   have prevented the collision "if he had not made his turning movement within close proximity to

16   the suspects."  Sciba Decl. ¶ 9; *see also* Buelna Decl., Ex. 11 (Sciba memo).[10]

17        Lt. Lagorio was another supervisor on duty the day of the incident.  He responded to the

18   scene and also thereafter conducted an investigation, ultimately agreeing with Sgt. Sciba's

19   conclusions.  *See* Lagorio Decl. ¶¶ 3, 6; *see also* Buelna Decl., Ex. 12 (Lagorio memo).[11]

20   "Officer Ribeiro was disciplined for the incident with a documented oral counseling."  Lagorio

21   Decl. ¶ 7.

22                  **II.**       **DISCUSSION**

23   A.    Legal Standard

24        Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

25

26   _____

[10] For no apparent reason, Defendants have objected to the Sciba memo.  The memo is consistent
27   with the declaration.  And even if it were not, Mr. Martin would still be able to show that the
memo could be admitted at trial.

28   [11] As above, for no apparent reason, Defendants have objected to the Lagorio memo.

United States District Court
Northern District of California

1    [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

2    the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is

3    genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

4    *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a

5    scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

6    reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence

7    must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

8    are to be drawn in the nonmovant's favor. *See id.* at 255.

9        Where a defendant moves for summary judgment based on a claim for which the plaintiff

10   bears the burden of proof, the defendant need only by pointing to the plaintiff's failure "to make a

11   showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

12   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

13       Where a plaintiff moves for summary judgment on claims that he has brought (*i.e.*, for

14   which he has the burden of proof), he "must prove each element essential of the claims . . . by

15   undisputed facts." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 607 (N.D. Cal. 1992).

16   B.   First Cause of Action – Unlawful Seizure

17       The first cause of action is a claim for unlawful seizure. The complaint describes the

18   unlawful seizure claim as follows: at the time Mr. Martin was hit and run over, Officer Ribeiro

19   "did not have *reasonable suspicion and/or probable cause* to justify any seizure whatsoever.

20   Defendant simply ran over Plaintiff and determined afterwards if he matched the identifying

21   information of a suspect." Compl. ¶ 19 (emphasis added).

22       The unlawful seizure claim has been asserted against Officer Ribeiro only. Officer Ribeiro

23   has moved for summary judgment on the claim.

24       The Court grants Officer Martin's motion. In his opposition brief, Mr. Martin did not brief

25   the unlawful seizure claim. Furthermore, even assuming that Officer Ribeiro seized Mr. Martin at

26   the time Mr. Martin was hit and run over (this issue is in dispute, as discussed below), there is no

27   indication that Officer Ribeiro lacked reasonable suspicion or probable cause to stop Mr. Martin.

28   Dispatch had reported a physical description of the suspects as well as their location, and further

United States District Court
Northern District of California

11

had reported that one of the suspects had brandished a knife.[12]  Accordingly, the Court grants Officer Ribeiro summary judgment on the unlawful seizure claim.

C.       Second Cause of Action – Excessive Force

The second cause of action is a claim for excessive force in violation of the Fourth Amendment.  Mr. Martin asserts that Officer Ribeiro used excessive force against him when the officer hit him, ran over him, and then ran over him a second time.

The excessive force claim has been asserted against Officer Ribeiro only.  Both parties have moved for summary judgment on the claim.  (Mr. Martin has moved only with respect to liability, not damages.)

1.       Elements of Excessive Force Claim Under the Fourth Amendment

Where an excessive force claim is brought under the Fourth Amendment, the force used takes place in the context of a seizure.  *See Graham v. Connor*, 490 U.S. 386, 394 (1989) ("Where . . . the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person.").  A court evaluates whether the force used in the seizure was reasonable under the circumstances.  *See id.* at 395.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of '"the nature and quality of the intrusion on the individual's Fourth Amendment interests"' against the countervailing governmental interests at stake."  *Id.* at 396.  Factors that can be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Id.*

2.       Whether a Seizure Took Place

As indicated by the above, an essential element in a Fourth Amendment excessive force claim is that force was applied in the context of a seizure specifically.  According to Officer

---

[12] The Court need not address whether probable cause or reasonable suspicion is the proper standard to apply here, as Mr. Martin did not oppose the summary judgment motion on this issue.

United States District Court
Northern District of California

1    Ribeiro, he is entitled to summary judgment because the collision at issue was accidental, and an

2    accidental collision does not constitute a seizure for purposes of the Fourth Amendment.  In

3    support of his position, he cites *Brower v. County of Inyo*, 489 U.S. 593 (1989).

4         Because *Brower* is a critical case, it is worth discussing in some detail.  The plaintiffs in

5    *Brower* were the heirs of a man who had died after crashing into a police roadblock.  The decedent

6    had stolen a car and had been driving it at high speed for about 20 miles in the attempt to elude the

7    police.  The plaintiffs argued that the defendants used excessive force in establishing the

8    roadblock.  *See id.* at 594.

9         The Ninth Circuit dismissed the excessive force claim on the ground that no seizure had

10   taken place.  The Supreme Court disagreed.

> The Court of Appeals was impelled to its result by consideration  of
> what it described as the "analogous situation" of a police chase in
> which the suspect unexpectedly loses control of his car and crashes.
> We agree that no unconstitutional seizure occurs there, but not for a
> reason that has any application to the present case.  Violation of the
> Fourth Amendment requires an *intentional acquisition of physical
> control*.  A seizure occurs even when an unintended person or thing
> is the object of the detention or taking, but the detention or taking
> itself must be *willful*. . . . [T]he Fourth Amendment addresses
> "misuse of power," not the accidental effects of otherwise lawful
> government conduct.
>
> Thus, if a parked and unoccupied police car slips its brake and pins a
> passerby against a wall, it is likely that a tort has occurred, but not a
> violation of the Fourth Amendment.  And the situation would not
> change if the passerby happened, by lucky chance, to be a serial
> murderer for whom there was an outstanding arrest warrant – even
> if, at the time he was thus pinned, he was in the process of running
> away from two pursuing constables.  It is clear, in other words, that
> a Fourth Amendment seizure does not occur whenever there is a
> governmentally caused termination of an individual's freedom of
> movement (the innocent passerby), nor even whenever there is a
> governmentally caused and governmentally *desired* termination of
> an individual's freedom of movement (the fleeing felon), but only
> when there is a governmental termination of freedom of movement
> *through means intentionally applied*.  That is the reason there was
> no seizure in the hypothetical situation that concerned the Court of
> Appeals.  The pursuing police car sought to stop the suspect only by
> the show of authority represented by flashing lights and continuing
> pursuit; and though he [*i.e.*, the suspect] was in fact stopped, he was
> stopped by a different means – his [*i.e.*, the suspect's] loss of control
> of his vehicle and the subsequent crash.  If, instead of that, the
> police cruiser had pulled alongside the fleeing car and sideswiped it,
> producing the crash, then the termination of the suspect's freedom of
> movement would have been a seizure.

*Id.* at 595-97 (emphasis added and in original); *see also Scott v. Harris*, 550 U.S. 372, 381 (2007) (noting that officer "does not contest that his decision to terminate the car chase by ramming his bumper into respondent's vehicle constituted a 'seizure'"); *County of Sacramento v. Lewis*, 523 U.S. 833, 836-37, 843-44 (1998) (holding that there was no seizure where officer pursued motorcyclist and passenger in police car, motorcycle tipped over as motorcyclist tried a sharp left turn, and officer slammed on brakes and then hit passenger; indicating that officer "accidentally stopped the suspect by crashing into him").

Turning to the facts before it, the *Brower* Court noted that

> Petitioners have alleged the establishment of a roadblock crossing both lanes of the highway. In marked contrast to a police car pursuing with flashing lights, or to a policeman in the road signaling an oncoming car to halt, a roadblock is not just a significant show of authority to induce a voluntary stop, but is designed to produce a stop by physical impact if voluntary compliance does not occur. It may well be that respondents here preferred, and indeed earnestly hoped, that Brower would stop on his own, without striking the barrier, but we do not think it practicable to conduct such an inquiry into subjective intent. Nor do we think it possible, in determining whether there has been a seizure in a case such as this, to distinguish between a roadblock that is designed to give the oncoming driver the option of a voluntary stop (e.g., one at the end of a long straightaway), and a roadblock that is designed precisely to produce a collision (e.g., one located just around a bend). In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line, or we will be driven to saying that one is not seized who has been stopped by the accidental discharge of a gun with which he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg. We think *it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.* It was enough here, therefore, that, according to the allegations of the complaint, *Brower was meant to be stopped by the physical obstacle of the roadblock – and that he was so stopped.*

*Brower*, 489 U.S. at 598-99 (emphasis added).

Relying on *Brower*, Officer Ribeiro contends that there was no seizure in the instant case because, even though he intended to stop Mr. Martin, he did not intend to stop Mr. Martin by hitting Mr. Martin or running Mr. Martin over; rather, the collision was an accident. Under that fact scenario, courts have interpreted *Brower* consistent with Officer Ribeiro's position. *See, e.g.*, *Soto v. Gaudett*, 862 F.3d 148, 161 (2d Cir. 2017) (in a case involving a car chase and then a foot

*United States District Court*
*Northern District of California*

chase by the police, ending with the plaintiff on foot being hit by a police car and then being tased after running away, agreeing with the district court that there was a dispute of fact "as to whether or not [the officer driving the car] hit [the plaintiff] intentionally"); *Evans v. Hightower*, 117 F.3d 1318, 1321 (11th Cir. 1997) (stating that plaintiff "failed to offer any evidence that the act of running him over with a patrol car was intended as a means to seize him"); *Simpson v. City of Dearborn*, No. 18-13156, 2019 U.S. Dist. LEXIS 207724, at *14-17 (E.D. Mich. Dec. 3, 2019) (discussing several district court cases where an officer was trying to cut the plaintiff off, was trying to corral the plaintiff with the police car, or chased the plaintiff with the police car, but then accidentally hit the plaintiff ); *Toscano v. City of Fresno*, No. 1:13-cv-01987-SAB, 2015 U.S. Dist. LEXIS 97018, at *11-12 (E.D. Cal. July 24, 2015) (in a case where a police officer pursued an individual – the officer in his car and the individual on a bicycle – and ran over the individual, killing him, stating that there was a dispute of fact as to whether the officer intentionally bumped the bicycle or whether the officer accidentally hit the bicycle as it was falling over); *McCormack v. Town of Whitman*, No. 10-10461-PBS, 2013 U.S. Dist. LEXIS 38637, at *23-24 (D. Mass. Mar. 20, 2013) (in a case where officer acknowledged using the police car to "'head off'" the plaintiff "in order to prevent him from evading arrest," concluding there was "a dispute of fact as to whether Officer Leavitt intentionally swerved into Plaintiff in order to prevent him from running or whether the collision was accidental").

The problem for Officer Ribeiro is that that his argument is predicated on the assumption that the collision was in fact accidental, and not intentional. The above cases generally indicate that disputes of fact regarding intent cannot be resolved on summary judgment. In the instant case, there is a genuine dispute as to whether Officer Ribeiro intentionally hit Mr. Martin to apprehend him. For example, the video shows that Officer Ribeiro was driving quite closely to Mr. Martin and his cousin. Also, Mr. Martin testified that, when he moved left, the police car followed him; when he moved right, the police car followed him again. Arguably, instead of this course of action, Officer Ribeiro could have sped past Mr. Martin and his cousin and cut them off further down the bike trail. Accordingly, the Court denies Officer Ribeiro's motion for summary judgment; a reasonable jury might well reject Officer Ribeiro's contention that his hitting of Mr.

Martin was accidental and conclude Mr. Martin was intentionally struck by the car in order to stop him.

In his own summary judgment motion, Mr. Martin does not agree with the above analysis. According to Mr. Martin, there is *no* dispute that there *was* a seizure because there is no dispute that (1) Officer Ribeiro was trying to stop Mr. Martin and (2) Officer Ribeiro intended to make the turn that resulted in Mr. Martin being hit. *See* Pl.'s Mot. at 13 (arguing that it does not matter whether Officer Ribeiro "intend[ed] to run over Plaintiff"; "[t]he only important fact is that Defendant intended to use his car to restrain Plaintiff's movement"). Mr. Martin indicates that whether or not Officer Ribeiro intended to hit him simply goes to subjective intent, which is irrelevant under the Fourth Amendment.

Mr. Martin's argument is not entirely without merit. *Brower* is somewhat confusing in that it states both that a seizure requires intentional conduct and that subjective intent is not to be inquired into. Nevertheless, Mr. Martin's interpretation of *Brower* is incorrect. To understand the holding in *Brower*, it should be borne in mind that an excessive force claim was at issue, and not some other kind of unlawful seizure claim – in particular, an unlawful seizure claim that did not involve the application of any force at all.

The Supreme Court has explained that a seizure can take place by means of physical force *or* a show of authority. "A person is seized by the police . . . when the officer, by means of physical force *or* show of authority, terminates or restrains his freedom of movement." *Brendlin v. Cal.*, 551 U.S. 249, 254 (2007) (emphasis added). But notably, a show of authority by itself does not constitute a seizure unless the suspect actually submits to that show of authority. *See id.* (stating that "[a] police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission"); *Cal. v. Hodari*, 499 U.S. 621, 629 (1991) ("assuming that [the officer's] pursuit in the present case constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled"); *see also Nelson v. City of Davis*, 685 F.3d 867, 876 n.4 (9th Cir. 2012) (stating that "the mere assertion of police authority, without the application of force, does not constitute a seizure unless an individual submits to that authority"; but, "when that show of

16

authority includes the application of physical force, a seizure has occurred even if the object of that force does not submit").[13]

Although a seizure can take place by means of physical force or a show of authority, an excessive force claim, *by its very nature*, involves physical force and not just a show of authority. Thus, in *Brower*, where the claim at issue was excessive force, the question naturally was whether the police intended to apply that physical force (the roadblock) to the decedent. *Cf. Nelson*, 685 F.3d at 877 (indicating that, even if officers did not intend to hit students with pepperball projectiles and instead simply intended "to subject the students to a shower of pepper spray via area contamination," the officers still "intentionally directed their use of force at the students"; adding that "[w]hether the officers intended to encourage the partygoers to disperse is of no importance when determining whether a seizure occurred"[14]). Here, if Officer Ribeiro did not intend to hit Mr. Martin and instead was simply pursuing him and trying to cut him off, that would be a mere show of authority – for which there could be no seizure unless and until Mr. Martin submitted to that show of authority. Mr. Martin, therefore, is not correct in arguing that there was a seizure so long as Officer Ribeiro intentionally turned his car. The question is whether he intentionally turned his car *to hit Mr. Martin*. *See Lewis*, 523 U.S. at 836-37, 843-44 (1998) (holding that there was no seizure where officer pursued motorcyclist and passenger in police car, motorcycle tipped over as motorcyclist tried a sharp left turn, and officer slammed on brakes and

---

[13] In *Hodari*, the Supreme Court acknowledged certain language used in a prior case, *United States v. Mendenhall*, 446 U.S. 544 (1980) – *i.e.*, "'[a] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Hodari*, 499 U.S. at 628. But the Court emphasized that Mendenhall should not be misconstrued: "It says that a person has been seized 'only if,' not that he has been seized 'whenever'; it states a necessary, but not a sufficient, condition for seizure – or, more precisely, for seizure effected through a 'show of authority.'" *Id.*

Notably, *Hodari* was issued *after* one of the cases on which Mr. Martin heavily relies. *See* Pl.'s Reply at 5 (arguing that "this case falls squarely within *Michigan v. Chesternut*, 486 U.S. 567 (1988), where the Court held activating sirens and/or flashers or 'operat[ing] the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement' would suggest a seizure under the Fourth Amendment").

[14] Presumably, this is the kind of subjective intent that does not matter for Fourth Amendment purposes.

United States District Court
Northern District of California

1 then hit passenger; indicating that officer "accidentally stopped the suspect by crashing into him").

2   In his papers, Mr. Martin argues still that using a police car to cut off a person is

3 comparable to using a roadblock (as in *Brower*).  *See* Pl.'s Mot. at 12-13; *see also Brower*, 489

4 U.S. at 598 (noting that, even though the police may have preferred or hoped that "Brower would

5 stop on his own, without striking the barrier, . . . we do not think it practicable to conduct such an

6 inquiry into subjective intent"); *id.* at 598-99 (for purposes of determining whether a seizure has

7 taken place, rejecting distinction "between a roadblock that is designed to give the oncoming

8 driver the option of a voluntary stop (*e.g.*, one at the end of a long straightaway), and a roadblock

9 that is designed precisely to produce a collision (*e.g.*, one located jury around a bend").  Similar to

10 above, Mr. Martin's argument is not without basis; however, it is ultimately not persuasive.  The

11 Supreme Court made clear in *Brower* that it was affording roadblocks special and unique

12 significance: "[A] roadblock is not just a significant show of authority to *induce* a voluntary stop,

13 but is *designed to produce a stop by physical impact* if voluntary compliance does not occur."

14 *Brower*, 489 U.S. at 598 (emphasis added).  Here, assuming that all Officer Ribeiro intended to do

15 was use the police car to cut off Mr. Martin and not hit him, then the maneuver cannot fairly be

16 characterized as – like a roadblock – being designed to produce an inescapable stop by physical

17 impact in the absence of voluntary compliance.

18   3. <u>Reasonableness of Force Used During Seizure</u>

19   Because there is a genuine dispute as to whether there was a seizure, that would ordinarily

20 be the end of the inquiry – *i.e.*, both parties' motions for summary judgment should be denied.

21 Officer Ribeiro, however, has argued that, even if there was a seizure, he would still be entitled to

22 summary judgment because the only conclusion that a reasonable jury could arrive at was that the

23 force used was reasonable under the circumstances.  *See Torres v. City of Madera*, 524 F.3d 1053,

24 1056 (9th Cir. 2008) (stating that "[t]he reasonableness of a particular use of force is judged 'from

25 the perspective of a reasonable officer on the scene,' and 'in light of the facts and circumstances

26 confronting them'").

27   The Court rejects Officer Ribeiro's argument because a reasonable jury could well find

28 that the force used was not reasonable based on the circumstances, particularly when all facts and

United States District Court
Northern District of California

reasonable inferences therefrom are construed in Mr. Martin's favor.  *See generally Estate of Lopez v. Gelhaus*, 8871 F.3d 998, 1010 (9th Cir. 2017) (in assessing whether a reasonable jury could find use of excessive force, viewing the facts in the light most favorable to plaintiffs).  As noted above, "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of '"the nature and quality of the intrusion on the individual's Fourth Amendment interests"' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396.  Factors that can be considered include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  Moreover, the Supreme Court has held that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. . . . Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."  *Tenn. v. Garner*, 471 U.S. 1, 11 (1985); *see also Blanford v. Sacramento County*, 406 F.3d 1110, 1117-18 (9th Cir. 2005) (noting that "*Garner* articulates a more particularized version of the Fourth Amendment's objective reasonableness analysis for assessing the reasonableness of deadly force").  In contrast,

> [w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force.  Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Garner*, 471 U.S. at 11-12; *see also id.* at 3 ("conclud[ing] that [deadly] force may not be used unless it is necessary to prevent the escape [of a suspected felon] and the officer has probable cause to believe that the suspect poses a *significant* threat of death or serious physical injury to the officer or others") ( emphasis added).  *See, e.g.*, *Blanford*, 406 F.3d at 1117-18 ("conclud[ing] that the first [gun] volley [by the police] was objectively reasonable and that the deputies had probable cause to believe that Blanford posed a threat of serious physical harm to themselves, or to others,

United States District Court
Northern District of California

19

1    because he was armed, refused to give up his weapon, was not surrounded, and was trying to get

2    inside a private residence or in default of that, into the back yard, where his sword could inflict

3    injury that the deputies would not then be in a position to prevent").

4           In the instant case, the facts viewed in the light most favorable to Mr. Martin are as

5    follows:

6           • Although dispatch reported that a shooting threat had been made to the security

7               guards, dispatch did not specify who had made the threat (Mr. Martin or his

8               cousin), and dispatch included the express qualification that no weapons had

9               actually been seen.

10          • Although dispatch reported that one of the males specifically had brandished a

11              knife; dispatch never reported the actual use of the knife on the security guards.

12              Moreover, that the suspect had purportedly been bold enough to brandish a knife

13              but not a gun suggests that he did not actually have a gun (as indicated in the first

14              dispatch) even if he had made a threat to shoot.  Hence, any suspicion the suspect

15              had a gun was weak.

16          • Although Mr. Martin admitted that he pulled up his pants when he was walking on

17              the bike trail before the police car came on to the trail and further admitted that he

18              might have pulled his pants up more than once on the trail, Mr. Martin did not

19              necessarily touch his waistband during the pursuit specifically (as Officer Ribeiro

20              claimed, which could suggest the reaching for a weapon).

21          • Officer Ribeiro did not specifically identify Mr. Martin as the suspect that wore the

22              Sharks hat (who supposedly brandished the knife);  there was no testimony saying

23              Officer Ribeiro thought Martin had the knife as opposed to his cousin.

24          • Officer Ribeiro admitted that he never saw a weapon, and no weapon was ever

25              recovered.  There was no evidence that Officer Ribeiro was in imminent danger.

26          • Officer Ribeiro knew that other officers were in the area since he was in radio

27              communication with them and/or dispatch during the pursuit; hence, there was

28              supportive backup to apprehend Mr. Martin.

20

- Even though Mr. Martin had climbed the fence at Capitol Expressway, and thus presumably could have climbed the fence at the bike trail – which would put him in the popular shopping center area – it would have taken Mr. Martin, even if he was the suspect reportedly seen with a knife, some time to climb the fence so the public was not in imminent danger, particularly since there was police backup.

- Hitting a person with a car, including as a means of stopping a person suspected of a crime, can cause death or serious bodily injury, particularly when the person is a pedestrian and not, *e.g.*, in another car. *See also Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (stating that "[a] moving vehicle can of course pose a threat of serious physical harm . . . if someone is at risk of being struck by it").

In light of the above, a reasonable jury could well conclude that, even if Mr. Martin was attempting to evade arrest by flight, the crime at issue was not particularly dangerous, as there was not physical confrontation in which the knife was drawn and there was  no stabbing or attempted stabbing or injury;  there was no imminent danger from Mr. Martin – whether to Officer Ribeiro or to the public – *see Gelhaus*, 871 F.3d at 1005 (stating that the most important factor under the *Graham* test is whether the suspect posed an immediate threat to the safety of the officers or others).  Therefore, using a car to hit and stop Mr. Martin, a maneuver that threatens life or serious bodily injury, constitutes excessive force.

In his papers, Officer Ribeiro relies on the Ninth Circuit's decision in *Torres* to argue that "[a] reasonableness inquiry . . . applies when an officer makes a mistake, as was the case here." Def.'s Mot. at 22; *see also* Def.'s Mot. at 24 (maintaining that Officer Ribeiro's mistake was "fail[ing] to advance far enough ahead of the suspects before turning to the right").  But in *Torres*, it was *undisputed* that the officer had made a mistake in drawing her Glock when she had meant to draw her Taser.  *See Torres*, 524 F.3d at 1056 ("There is no question that Officer Noriega intended to draw her Taser but mistakenly drew her Glock.").  Here, it is *disputed* whether Officer Ribeiro made a mistake or whether he acted intentionally to hit Mr. Martin.

       4.      Qualified Immunity

Finally, Officer Ribeiro contends that, even if the force he used was not reasonable under

1    the circumstances, he is still protected by qualified immunity.  *See generally Easley v. City of*

2    *Riverside*, 890 F.3d 851, 856 (9th Cir. 2018) (stating that officers are entitled to qualified

3    immunity "unless (1) they violated a federal statutory or constitutional right, and (2) the

4    unlawfulness of their conduct was clearly established at the time") (internal quotation marks

5    omitted).  A significant part of his qualified immunity argument is flawed at the outset – *i.e.*, his

6    reliance on cases assessing whether a seizure occurred in the first instance.  To get to qualified

7    immunity, there would have to be the finding that Officer Ribeiro intentionally used force on Mr.

8    Martin; thus, there would be a seizure.

9         This leaves Officer Ribeiro with the argument that, under the facts as construed in Mr.

10   Martin's favor, his intentional decision to use deadly force, *i.e.*, using his police car to hit and

11   thereby stop Mr. Martin, a pedestrian, did not violate clearly established law on excessive force.

12   Here, Officer Ribeiro primarily relies on the principle that, to overcome qualified immunity, a

13   plaintiff must show that it was clearly established at the time that the officer's conduct was

14   unlawful.  *See Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017) (stating that "the 'clearly

15   established' inquiry is a question of law that only a judge can decide").

16        The Court acknowledges that, in *White v. Pauly*, 137 S. Ct. 548 (2017), the Supreme Court

17   emphasized that "'clearly established law' should not be defined 'at a high level of generality'"

18   because, "[o]therwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into

19   a rule of virtually unqualified liability simply by alleging violation of extremely abstract right.'"

20   *Id.* at 552.  In addition, the *White* Court criticized the lower appellate court's decision because

21              [i]t failed to identify a case where an officer acting under similar
22              circumstances as Officer White was held to have violated the Fourth
             Amendment. Instead, the [panel] majority relied on *Graham*,
23              *Garner*, and their Court of Appeals progeny [excessive force cases],
             which . . . lay out excessive-force principles at only a general level.
24              Of course, "general statements of the law are not inherently
             incapable of giving fair and clear warning to officers, but "in the
25              light of pre-existing law the unlawfulness must be apparent."  For
             that reason, we have held that *Garner* and *Graham* do not
26              themselves create clearly established law outside "an obvious case."

27   *Id.* (emphasis added).

28        While *White* cautioned against finding clearly established law in the area of excessive

force in the absence of case law addressing similar facts, such case law is not invariably required; a violation of clearly established law can be found in "an obvious case." For instance, in *Hope v. Pelzer*, 536 U.S. 730 (2002), the plaintiff was a former prison inmate who asserted cruel and unusual punishment in violation of the Eighth Amendment when prison guards twice handcuffed him to a hitching post to sanction him for disruptive conduct. *See id.* at 733. The Supreme Court held that, based on the facts as alleged by the plaintiff, "the Eighth Amendment violation is obvious. Any safety concerns had long since abated by the time [the plaintiff] was handcuffed to the hitching post because [the plaintiff] had already been subdued, handcuffed, placed in leg irons, and transported back to the prison." *Id.* at 738 (also noting "the clear lack of an emergency situation"). Turning to qualified immunity, the Supreme Court noted that, "[a]rguably, the violation was so obvious that our own Eighth Amendment cases gave the respondents fair warning that their conduct violated the Constitution." *Id.* at 741. In other words, there was no need for the plaintiff to cite to a previous case with a fundamentally similar factual situation. *See id.* at 739-41; *see also id.* at 741 (noting that "a general constitutional rule already identified in the decisional law may apply with *obvious* clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful") (emphasis added; internal quotation marks omitted).[15] In a subsequent case, the Supreme Court indicated that *Hope* was, in fact, a case where the Eighth Amendment violation was so obvious that "there need not be a materially similar case for the right to be clearly established." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Here, when the facts are viewed in Mr. Martin's favor, the instant case presents an obvious constitutional violation.

Although Mr. Martin has not pointed to a specific case where an officer's intentional striking of a suspect with a car was held to violate the Fourth Amendment (perhaps because such conduct is so out of bounds there is no such prior case), obviousness arises from the following. First, the application of force here is potentially deadly – a car can kill a person or cause serious

---

[15] Ultimately, however, the Supreme Court found that there was a violation of clearly established law based on "binding Eleventh Circuit precedent, an Alabama Department of Corrections (ADOC) regulation, and a DOJ report informing the ADOC of the constitutional infirmity in its use of the hitching post." *Hope*, 536 U.S. at 741-42.

bodily injury, particularly when the person, a pedestrian, has no protection such as being inside another car.  Second, as noted above, viewing the facts in Mr. Martin's favor, Mr. Martin did not present an imminent threat to either the public or to Office Ribeiro.  At best, dispatch had reported that a knife, not a gun, had been seen and was possessed by one of two suspects matching the description of Mr. Martin and his cousin.  Mr. Martin did not ever reveal or pull out a knife during the pursuit.  Officer Ribeiro never saw a knife.  Officer Ribeiro did not know whether Martin is the suspect reportedly brandishing the knife to the security officer.  Third, a fence blocked Mr. Martin from the shopping center area, and other officers were in the area; thus there was no imminent threat to the public that required the use of potentially deadly force by Officer Ribeiro.

The Ninth Circuit decision in *Gelhaus*, although it involves some facts that are different from the instant case (*e.g.*, there, the decedent had not committed a serious crime, was not trying to evade arrest by fleeing from the police, and was near an open field in a residential neighborhood with few people in the neighborhood), is still instructive.  The case underscores that it is clearly established law that (1) the "mere possession of a weapon is insufficient to justify the use of deadly force"; that (2) an individual who is *visibly* holding a weapon is not necessarily an immediate threat; and that (3) a gun being held with the barrel down is not a basis on which deadly force can be applied, at least not without any objective sign of provocation.  *Gelhaus*, 871 F.3d at 1013, 1018-19 (discussing *George v. Morris*, 736 F.3d 829 (9th Cir. 2013)); *see also id.* at 1012-13 & n.13 (discussing cases where deadly force was applied when the suspect engaged in outwardly provocative conduct – *e.g.*, suspect reached for the waistband of his pants; suspect was holding a gun and pointing it at the police officers; suspect was behaving erratically, carrying a three-foot saber, consciously disobeyed a warning from police officers that they would shoot if he did not drop the saber, and tried to go inside a house; suspect was advancing at officers with a football-sized rock over his head and was given a warning; suspect attacked officer and turned officer's gun against him; suspect made a swing at officer with a knife).  Here, the facts viewed in Mr. Martin's favor, establish he was not visibly holding a weapon; the dispatch information about one of two suspects brandishing a knife created far less certainty about Mr. Martin actually possessing a knife than where the police officer sees the weapon.  The imminence of the risk to

24

officers or the public pales in comparison to that in *Gelhaus*. The underlying crime was threatening a security officer, while serious, did not involve *e.g.*, physical assault and battery, shooting, etc. *See id.*; *cf. Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997) (rejecting qualified immunity in a case where FBI agent shot a suspect – who was believed to have killed an FBI agent the previous day – without warning upon the suspect's returning home; "[l]aw enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed"); *Curnow v. Ridgecrest Police*, 952 F.2d 321, 323, 325 (9th Cir. 1991) (rejecting qualified immunity in a case where, viewing the evidence in the light most favorable to the nonmoving party, the suspect had a gun near him but did not reach for it or point it at the police before the police shot him).

The Court therefore denies Officer Ribeiro summary judgment on the issue of qualified immunity – in particular, to the extent Mr. Martin has claimed excessive force when the officer hit him and ran him over.

The Court also rejects Officer Ribeiro's contention that qualified immunity should apply to the extent there is a genuine dispute of material fact as to whether the officer backed over Mr. Martin *after* he had already been hit and run over and, if so, whether the officer intentionally (as opposed to accidentally) did so. Once Mr. Martin was initially hit and run over, he was clearly subdued. At that point, for Officer Ribeiro to then intentionally back over Mr. Martin (viewing the facts in the light most favorable to Mr. Martin) was obviously excessive because he had already been subdued. *Cf. Epifan v. Roman*, No. 3:11-cv-02591-FLW-TJB, 2014 U.S. Dist. LEXIS 137687, at *32-33 (D.N.J. Sept. 29, 2014) (evaluating "two instances of excessive force . . . : (1) whether Sgt. Roman intentionally hit Plaintiff when his official police vehicle collided with Plaintiff; and (2) whether Sgt. Roman intentionally dragged Plaintiff following the collision").

5.   Summary

Both parties' motions for summary judgment on the excessive force claim are denied. There is a genuine dispute as to whether Officer Ribeiro intentionally or accidentally applied force to Mr. Martin. If the application of force was intentional, a reasonable jury could find –

25

construing all facts in the light most favorable to Mr. Martin – that the force used was unreasonable.  And construing all facts in the light most favorable to Mr. Martin, qualified immunity would not apply, either for the initial hit and running over or for the backing up over Mr. Martin.

D.     Third Cause of Action: Unconstitutional Custom or Policy

The third cause of action is a claim for unconstitutional custom or policy.  The claim has been asserted against the City only.  Mr. Martin asserts that Officer Ribeiro "has not been re-trained or disciplined for explicit use of excessive and deadly force against an unarmed and incapacitated person."  Compl. ¶ 26.  Mr. Martin also alleges that "this incident is only the latest to a collection and trend of excessive and deadly force incidents committed by SJPD officers."  Compl. ¶ 26 (citing three incidents in which a person was shot and either killed or seriously injured).  Only the City has moved for summary judgment on the third cause of action.

Because "Plaintiff does not oppose Defendant['s] motion for summary judgment against his *Monell* claim," Pl.'s Opp'n at 9 n.3, the Court grants the City's motion on the claim for unconstitutional custom or policy.

E.     Fourth and Sixth Causes of Action: Battery in Violation of California Penal Code § 242 and Excessive Force in Violation of the Bane Act (California Civil Code § 52.1)

The fourth and sixth causes of action are state law claims – respectively, for battery in violation of California Penal Code § 242[16] and for excessive force in violation of the Bane Act.  *See* Cal. Civ. Code § 52.1.[17]  The battery claim is asserted against Officer Ribeiro only.  The §

---

[16] California Penal Code § 242 defines battery as "any willful and unlawful use of force or violence upon the person of another."  Cal. Pen. Code § 242.

[17] California Civil Code § 52.1 provides for liability where a person,

> whether or not acting under color of law, interferes by threat, intimidation, coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California].

Cal. Civ. Code § 52.1(b).

1    52.1 claim has been asserted against both Officer Ribeiro and the City.

2           Defendants argue that they are entitled to summary judgment on these claims based on an

3    immunity provided for in California Vehicle Code § 17004.  Section 17004 provides as follows:

4           A public employee is not liable for civil damages on account of
            personal injury to or death of any person or damage to property
5           resulting from the operation, in the line of duty, of an authorized
            emergency vehicle while responding to an emergency call or when
6           in the immediate pursuit of an actual or suspected violator of the
            law, or when responding to but not upon returning from a fire alarm
7           or other emergency call.

8    Cal. Veh. Code § 17004 (emphasis added).

9           1.     Officer Ribeiro

10          Mr. Martin contends that § 17004 does not afford Officer Ribeiro immunity because the

11   purpose of the statute is to protect officers from liability for accidental injuries only – *e.g.*, when

12   an officer is engaged in a high-speed car chase of a suspect and accidentally causes a crash,

13   whether impacting a bystander or the suspect.  Although this may rationally be presumed to be the

14   impetus for the law, Mr. Martin cites no caselaw, legislative history, or other authority to support

15   this proposition.  The text of § 17004 is broad and does not contain such a limitation.  In fact, the

16   reference in California Vehicle Code to "negligent *or* wrongful act[s] or omission[s]" by a public

17   entity, Cal. Veh. Code § 17004 (emphasis added), suggests that § 17001 covers more than just

18   accidents.  The Court therefore grants Officer Ribeiro summary judgment on the battery and §

19   52.1 claims.

20          2.     City

21          Unlike Officer Ribeiro, the City has been sued for a § 52.1 violation only (vicarious

22   liability); it has not been sued for battery.  The City cannot claim the benefit of § 17004 because,

23   on its face, the statute refers to a "public employee" not being liable.  Section 17004 says nothing

24   about the liability of a public entity.  In fact, public entity liability is addressed in California

25   Vehicle Code §§ 17001 and 17004.7.

26          •    Section 17001 provides as follows: "A public entity *is* liable for death or injury to

27               person or property proximately caused by a negligent or wrongful act or omission

28               in the operation of any motor vehicle by an employee of the public entity acting

within the scope of his employment."  Cal. Veh. Code § 17001 (emphasis added); *see also Brummett v. Cty. of Sacramento*, 21 Cal. 3d 880, 885 (1978) ("conclud[ing] . . . that section 17004 defined only a limited immunity, i.e., an employee immunity, and that section 17001 'otherwise' provides for public entity liability[;] Vehicle Code section 17001, therefore, is cognizable under the exception of section 815.2, subdivision (b)"[18]) (emphasis added).

- Section 17004.7 provides in relevant part as follows: "A public agency employing peace officers that adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits complying with subdivisions (c) and (d) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor vehicle by a peace officer employed by the public entity."  Cal. Veh. Code § 17004.7(b)(1).

In Defendants' motion for summary judgment, the City did not invoke the protections afforded by § 17004.7.

F.   Fifth Cause of Action: Negligence

In the fifth cause of action, Mr. Martin asserts a claim for negligence.  The claim is asserted against both Officer Ribeiro and the City.  Mr. Martin has moved for summary judgment on the negligence claim – but only with respect to liability, but not with respect to the affirmative defense of comparative fault or damages.[19]

Presumably, by bringing a negligence claim, Mr. Martin is bringing an alternative theory

---

[18] California Government Code § 815.2(b) provides: "*Except as otherwise provided by statute*, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability."  Cal. Gov't Code § 815.2 (emphasis added).

[19] At the hearing, the City seemed to suggest that Mr. Martin only moved for summary judgment with respect to Officer Ribeiro, and not the City.  For purposes of this opinion, the Court assumes that Mr. Martin moved for summary judgment as to both Defendants.

United States District Court
Northern District of California

1   of liability – *i.e.*, asserting that, even if the collision was *accidental* (thus, no seizure), Officer

2   Ribeiro, as well as the City, can still be held liable.  That being the case, Defendants' argument

3   that Officer Ribeiro acted reasonably, as discussed in conjunction with the excessive force claim,

4   is off point.

5          However, if Officer Ribeiro only acted negligently, it is clear that he would be afforded the

6   protection of § 17004 immunity.  The Court therefore denies Mr. Martin's motion for summary

7   judgment as to Officer Ribeiro.

8          This leaves Mr. Martin's motion for summary judgment against the City.  The City's

9   liability is predicated on respondeat superior liability.  Thus, if Officer Ribeiro acted negligently,

10  then the City would be held vicariously liable (unless it had a basis for asserting immunity).  As to

11  whether Officer Ribeiro acted negligently, the Court concludes that there is a genuine dispute of

12  material fact.  Admittedly, there are many facts that weigh in Mr. Martin's favor.  The video

13  footage shows that, at points during the pursuit, the police car seemed only a few feet behind Mr.

14  Martin; in fact, Officer Ribeiro admitted that at times he was as close as 3 feet.  Moreover, two of

15  Officer Ribeiro's supervisors concluded that the collision could have been prevented if Officer

16  Ribeiro had not "made his turning movement within close proximity to the suspects."  Sciba Decl.

17  ¶ 9.  (Both supervisors, of course, also found Mr. Martin's behavior a contributing factor to the

18  accident.)  Given these facts, it is not difficult to imagine a jury finding Officer Ribeiro negligent,

19  which would then trigger the City's liability.

20         That being said, it is still possible that a reasonable jury could find that Officer Ribeiro was

21  not negligent.  For example, it is possible that a reasonable jury could find that, even if the

22  collision could have been prevented by the officer cutting Mr. Martin off further down the bike

23  trail, that does not mean that the officer negligently executed the turn (*e.g.*, too early, too sharply).

24  A reasonable jury might also find that Mr. Martin's actions (including his inebriation and sudden

25  change in direction) caused the contact with the car.

26         The Court therefore denies the motion for summary judgment as to the City as well.

27  ///

28  ///

United States District Court
Northern District of California

### III.    CONCLUSION

For the foregoing reasons, Mr. Martin's motion for summary judgment on the excessive force and negligence claims (second and fifth causes of action) is denied.

As for Defendants' motion, the Court grants it in part.  Specifically, the Court grants the motion with respect to the first, third, and fourth causes of action (unlawful seizure, unconstitutional custom or policy, and battery).  The Court also grants summary judgment to Officer Ribeiro – but not the City – on the sixth cause of action (violation of § 52.1).  The motion is otherwise denied.

This leaves for trial: (1) excessive force (against the officer); (2) negligence (against the City) (if the officer were to move for summary judgment, he would have § 17004 immunity); and (3) § 52.1 (against the City).

This order disposes of Docket Nos. 47 and 48.


**IT IS SO ORDERED**.


Dated: October 6, 2020

_____
EDWARD M. CHEN
United States District Judge